FILED
2023 Aug-07  AM 11:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

**BARBARA C. MONK,** *individually and as the executrix of the estate of Jimmy Allen Monk, deceased,*
Plaintiff,

**v.**

Case No. 1:22-cv-1030-CLM

**UNITED STATES, *et al.*,**
Defendants.

## MEMORANDUM OPINION

Jimmy Monk died after contracting COVID-19 in the Talladega Federal Prison. His wife sued the United States, the Federal Bureau of Prisons, and nine individual defendants for personal injury, wrongful death, and loss of consortium.

The United States moved to dismiss Monk's FTCA claims against it. (Doc. 12). Individual defendants Gentry, Hanson, Holbrook, Jackson, Lassiter, Mourtada, and Williams also moved to dismiss the *Bivens* claims against them (doc. 26), and individual defendant Nash later moved to dismiss the *Bivens* claims against her (doc. 37). One individual defendant, Stanley Dickerson, has not moved to dismiss the claims against him.

For the reasons stated below the court will **GRANT** the United States' motion to dismiss the claims against it (doc. 12) and will **DISMISS** any claims against the United States Federal Bureau of Prisons. The court will also **GRANT** the individual defendants' motions to dismiss the claims against them. (Docs. 26, 37).

Because defendant Stanley L Dickerson has not moved to dismiss the claims against him, those claims remain.

## BACKGROUND

Jimmy Monk was convicted of bank fraud and sentenced to serve one year and a day in the Talladega Federal Prison. Monk started his sentence on October 1, 2020—*i.e.*, during the COVID-19 pandemic.

1. <u>COIVD measures</u>: The United States took several measures to deal with the pandemic's effect on federal prisons before Monk arrived. Attorney General William Barr first sent a memo to the Bureau of Prisons (BOP) on March 26, 2020. It directed the BOP to prioritize home confinement under existing statutory authority where appropriate. In determining when to utilize home confinement, the BOP was to consider the totality of the circumstances, statutory requirements for home confinement, and a list of non-exhaustive discretionary factors. Those factors included the vulnerability of the inmate, the security level of the facility, the inmate's conduct in prison, the inmate's PATTERN score, the conditions of and plan for home confinement, and the inmate's crime of conviction. The BOP had statutory authority to release prison inmates to home confinement under 18 U.S.C. § 4042(a) (BOP duties), 18 U.S.C. § 3624 (c)(2) (home confinement authority), and 34 U.S.C. § 6054(g) (elderly and family reunification for certain nonviolent offenders).

Congress passed the CARES Act the next day. *See* Pub. L. No. 116-136, 134 Stat. 281. It provided that during the COVID pandemic, "the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2)."

AG Barr followed up with another memo a few days after Congress passed the CARES Act. That memo directed the BOP to prioritize the use of home confinement to combat COVID where appropriate. Barr stated that "I am therefore directing you to immediately review all inmates who

have COVID-19 risk factors," and immediately process all inmates the BOP finds suitable for home confinement.

Other existing regulations also guided the BOP's handling of COVID. C.F.R. 522.21 provided that the warden of the prison should interview inmates to determine whether they should be housed separately, and medically screen the inmate within 24 hours of arrival. C.F.R. 549.10 provided that the BOP "will manage infectious diseases in the confined environment of a correctional setting through a comprehensive approach which includes testing, appropriate treatment, prevention, education, and infection control measures." And C.F.R. 549.13 sets out guidelines for handling inmates with infectious diseases.

Before Monk arrived in October, the BOP provided a home confinement update. It gave the warden the final decision authority to refer inmates for home confinement. It also provided that, among other things, inmates should not be approved for home confinement if they have not served 50% or more of their sentence.

2. <u>Monk's death</u>: Monk was at high risk for complications from COVID-19 when he arrived at Talladega: he was obese, had received double bypass heart surgery, had an out of rhythm heart, high blood pressure, high cholesterol, was borderline diabetic, and was also over 60 years old. Central to Ms. Monk's allegations is that the prison officials ignored these risk factors when deciding whether and how to prevent Mr. Monk from contracting the virus and whether and how to treat him for the virus.

Talladega prison experienced a COVID outbreak in early December 2020. Over a four-day span, 20 inmates tested positive for COVID. Monk alleges that the prison isolated those inmates, but not the inmates they had been in contact with. Monk also alleges that Mr. Monk was denied treatment for an illness about a week later, and that even though five more inmates tested positive for COVID the day after the outbreak, the

prison failed to take measures to protect other inmates or treat Mr. Monk's illness.

Mr. Monk tested positive for COVID three days later and attempted to visit the prison doctor (defendant Mourtada). But Mourtada denied him treatment. Mr. Monk later passed out in the shower and began vomiting. His wife alleges that other inmates tried to place Monk in a chair, but that the prison officials ordered the inmates to stay away from him. The prison then transported him to an outside hospital where he was pronounced dead because of COVID and cardiovascular disease.

3. <u>The lawsuit</u>: Ms. Monk filed an administrative claim in her capacity as executor of Mr. Monk's estate that claimed the BOP and United States negligently and wrongfully killed Mr. Monk and sought damages for his wrongful death. That claim did not mention Ms. Monk's personal claims.

Ms. Monk then sued the United States, the BOP, and the following individual defendants for Mr. Monk's death: Cheron Nash (warden at Talladega), Keith Williams (associate warden), Celia Hanson (employee), Destiney Lassiter (unit manager where Monk was housed), FNU Jackson (Monk's case manager), Dr. Moonir Mourtada (physician at Talladega), Dr. William Holbrook (physician at Talladega), Stanley Dickerson (employee), and FNU Gentry (federal government agent).

Monk's central allegations are that the United States, BOP, and prison officials failed to follow COVID directives from the federal government, failed to screen and test inmates for COVID, returned symptomatic inmates to the general population and failed to properly isolate inmates with COVID, and failed to properly treat inmates who were sick. Monk alleges that these failures deprived Mr. Monk of his Eighth Amendment rights.

## STANDARDS OF REVIEW

### A. Rule 12(b)(6)

The individual defendants seek dismissal under Rule 12(b)(6). Under Federal Rule of Civil Procedure 8(a)(2), a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss under Rule 12(b)(6), the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. 544, 556).

### B. Rule 12(b)(1)

The United States seeks dismissal under Rule 12(b)(1). Federal Rule of Civil Procedure 12(b)(1) allows the court to dismiss a complaint for lack of subject matter jurisdiction. A party may challenge jurisdiction under Rule 12(b)(1) as either a facial attack or a factual attack. A facial attack challenges whether the allegations of subject matter jurisdiction are sufficient, taking all allegations in the plaintiff's complaint as true. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). On the other hand, a factual attack challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* The United States' motion to dismiss makes both a facial attack and a factual attack.

When a party makes a factual attack, the court's ability to make findings of fact and weigh evidence depends on whether the attack implicates the merits of the plaintiff's claim. *Garcia v. Copenhaver, Bell & Associates*, 104 F.3d 1256, 1261 (11th Cir. 1997). When the

jurisdictional challenge implicates the merits of the claim, the district court should "find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* at 1261. But when the challenge does not implicate the merits of the claim, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.*; *Lawrence*, 919 F.2d at 1529 (explaining that with a factual attack, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.").

The inquiry into whether Monk's claims are subject to the discretionary function of the FTCA does not implicate the merits of the claims, so the court may weigh evidence, including extrinsic evidence if it deems doing so necessary.

## DISCUSSION

### I.   Monk's Claims Against the Federal Bureau of Prisons

The United States argues that the court should dismiss the claims against the United States BOP and its employees for lack of subject-matter jurisdiction because the United States—not its agencies or employees—are the only proper defendants in an FTCA claim. Monk concedes that the BOP is not a viable defendant in his matter. (Doc. 21, p. 1). So the court **DISMISSES** all claims against the United States Federal Bureau of Prisons.

### II.   Monk's Claims Against the United States

Monk sues the United States under the FTCA for negligence, claiming it is liable for the prison employees' acts that caused Monk's death. She also incorporates her alleged violation of her Eighth Amendment rights into her FTCA claim. Central to Monk's claims against the United States is the BOP's failure to follow federal COVID guidelines that led to Mr. Monk contracting and ultimately dying from COVID.

The United States argues the court should dismiss the claims against it for lack of subject-matter jurisdiction, asserting both a facial and a factual attack on the complaint The United States argues that its facial attack should prevail because it is apparent from the face of the complaint that the United States has not waived sovereign immunity for the claims—*i.e.*, that exceptions to the FTCA apply. And the United States argues that even if a facial attack fails, a factual attack should prevail because (1) Mr. Monk's estate—not Ms. Monk personally—filed an administrative claim before suing, so Ms. Monk has failed to exhaust her administrative remedies, and (2) one or more of the individuals at Talladega were health care providers and, as private persons, are shielded from the covid-related FTCA claims under Alabama's COVID Immunity law. For the reasons stated below, the court agrees with the United States that its facial attack should prevail because at least one exception to the FTCA shields the United States from Monk's claims against it.

1. The FTCA and the Discretionary Function Exception:

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). When the government has not waived sovereign immunity for a claim, the court should dismiss the claim for a lack of subject-matter jurisdiction. F.R.C.P. 12(b)(1); *See Meyer*, 510 U.S. at 475. When the government has waived its sovereign immunity, "a court must strictly observe the 'limitations and conditions upon which the Government consents to be sued' and cannot imply exceptions not present within the terms of the waiver." *Zelaya v. United States*, 781 F.3d 1315, 1322 (11th Cir. 2015) (quoting *Soriano v. United States*, 352 U.S. 270, 276 (1957)).

The FTCA waives the United States' sovereign immunity for certain torts but is subject to exceptions within the statute. One exception is the discretionary-function exception. 28 U.S.C. § 2680(a).

The discretionary-function exception carves out an exception to the FTCA's waiver of sovereign immunity for any common-law tort claim that is "based upon the exercise or performance or the failure to exercise or

perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "In short, the discretionary function exception serves to preserve sovereign immunity for any claim that is based on a federal agency or employee's performance or nonperformance of a discretionary task, even if, in so acting, the agency employee may have abused his discretion." *Zelaya*, 781 F.3d at 1329.

The Supreme Court has established a two-part test to determine the applicability of the discretionary function exemption. "First, the conduct that forms the basis of the suit must involve an element of judgment or choice by the employee." *Zelaya*, 781 F.3d at 1229 (citing *Berkovitz v. United States,* 486 U.S. 531, 536 (1988)). This step focuses on "whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner." *Hughes v. United States,* 110 F.3d 765, 768 (11th Cir. 1997). "[U]nless a 'federal statute, regulation, or policy specifically prescribes a course of action embodying a fixed or readily ascertainable standard,' it will be presumed that the particular act involved an element of judgment or choice." *Zelaya*, 781 F.3d at 1330 (citing *Autery v. United States,* 992 F.2d 1523, 1529 (11th Cir. 1993)).

If the government meets the first step, the second step requires the court to "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz,* 486 U.S. at 536. "A particular decision will be of the kind protected by the exception if it is the type of decision that one would expect to be inherently grounded in considerations of policy." *Zelaya*, 781 F.3d at 1330. "[W]hen a government agent is permitted to exercise discretion in making a particular decision—whether that permission is express or implied—'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" *Id.* (quoting United States *v. Gaubert,* 499 U.S. 315, 324 (1991)). And "in examining whether an employee's discretion is of the type grounded in public policy, one uses an objective test, and the employee's subjective intent is irrelevant." *Id.*

**Step One**: The United States argues that step one of the inquiry is met because while statutes, regulations, and policies guide the prison's treatment of Mr. Monk, they do not compel the use of specific methods for operating and managing federal prisons. Monk responds that statutes, regulations, and directives all placed on BOP officials the requirement to act—to prevent the spread of COVID, treat Mr. Monk for COVID, and to utilize home confinement, and that the employees were without discretion to fail to act altogether.

The court agrees with the United States that the statutes, regulations, and policy memos Monk cites provide BOP officials with "an element of judgment or choice" and do not mandate a specific action. *Zelaya*, 781 F.3d at 1229.

Start with AG Barr's first memorandum. While it made clear that BOP officials should prioritize the use of home confinement, it also emphasized that the decision to utilize home confinement was discretionary. For example, Barr ordered officials to use home confinement "where appropriate," to "consider the totality of the circumstances" and provided a "non-exhaustive list of discretionary factors." (Doc. 1-5).

The pre-COVID statutes and CARES Act are no different. 18 U.S.C. § 4042 gives the BOP general management authority over federal prisons. 18 U.S.C. § 3624(c)(2) authorizes home confinement for "the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months" for "prisoners with lower risk levels and lower needs . . . ." 34 U.S.C. § 60541(g) established a pilot program for the Attorney General to "release some or all eligible elderly offenders and eligible terminally ill offenders . . . to home detention. . . ." And the CARES Act allowed the BOP to "lengthen the maximum amount of time for which the director is authorized to place a prisoner in home confinement under . . . section 3624(c)(2)." Plus, the statutes use the permissive "may," allowing the BOP and AG discretion to determine when home confinement is appropriate.

All these statutes make clear that it is up to BOP officials to use their judgment to recommend inmates for home confinement.

AG Barr's second memo retains the same discretionary nature as his first. He titled the memo "[i]ncreasing the use of home confinement at institutions most affected by COVID-19." But he again noted that home confinement should only be utilized "where appropriate." He specifically ordered officials at FCI Oakdale, FCI Danbury, FCI Elkton, and other similarly affected to immediately review all inmates with COVID risk factors. Yet the BOP officials still had discretion to determine which candidates were suitable for home confinement and were to use the same factors outlined in the March 26 memo.

Monk also cites various regulations, a prison bulletin, and prison handbooks to argue that the officials' conduct falls outside the discretionary function exception to the FTCA. Yet none of those regulations or policies *mandated* that Talladega release Mr. Monk to home confinement or treat him in a particular way. C.F.R. 522.21 provides that the warden should interview and screen inmates for infectious disease within 24 hours of arriving at the prison. C.F.R. 549.10 provides that the BOP "will manage infectious diseases in the confined environment of a correctional setting through a comprehensive approach which includes testing, appropriate treatment, prevention, education, and infection control measures." And C.F.R. 549.13 sets out guidelines for handling inmates with infectious diseases.

Prior to Monk's arrival, the BOP provided a home confinement update via bulletin. It gave the warden the final decision authority to refer inmates for home confinement. But that update explicitly said that, among other things, inmates should not be approved for home confinement if they have not served 50% or more of their sentence. Mr. Monk did not meet this criterion, so that update fails to establish that the BOP had a duty to treat him in a particular way or release him to home confinement. And the handbook sections that Monk cites also fail to place her claims within the FTCA.

None of the statutes, regulations, or policies that Monk cites establish that the BOP officials had to release Mr. Monk to home confinement. They also do not require the officials to treat Mr. Monk in a certain way or establish specific prison procedures relating to COVID. *See United States v. Wilson*, 2021 WL 5360084 (W.D. Pa. Nov. 17, 2021) ("[D]ecisions (regarding what COVID protocols to follow) are within the discretion of BOP and their determination of relative risk levels given the changing nature of the pandemic and the availability of vaccines.")

Monk cites a case from the District of South Carolina to support her argument that the court should allow the case to move forward to discovery. *Farmer v. United States*, No. 0:21-cv-2572-TMC, 2022 WL 3500363 (D. S.C. Aug. 18, 2022). Monk says that *Farmer* suggests that allegations that a federal prison disregarded the BOP's COVID action plan should survive a motion to dismiss because the action plan created a mandatory compliance system and therefore does not fall under the discretionary function exception to the FTCA.

The United States disagrees. It argues that the court in *Farmer* only allowed the case to go to discovery on the plaintiff's claim of negligence relating to the prison officials' failure to follow COVID action plans. *Id.* at *5. But the United States attached the documents the plaintiff submitted to support their claims, and those documents show that the action plans were "recommendations and best practices," not a mandate. Thus, the United States argues this also falls under the discretionary function exception.

The Court agrees with the United States. The court in *Farmer* held that COVID-related claims brought under 18 U.S.C. § 4042(a), 3624(c)(2), the CARES Act, and CDC guidelines are barred by the discretionary function exception. The *Farmer* court reasoned that the language in the "Action Plan" *could* be mandatory, so it denied the United States' motion to dismiss on that specific claim. But after careful review, this court finds that it contains no mandatory language. Thus, the court finds that the United States has satisfied step one of the discretionary-function inquiry.

**Step Two**: As explained above, the second step requires the court to "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz,* 486 U.S. at 536. That is, the court must determine whether the decision was "inherently grounded in considerations of policy." *Zelaya*, 781 F.3d at 1330. The court must presume that is the case "when a government agent is permitted to exercise discretion in making a particular decision." *Id.*

The United States says it has satisfied this step because the BOP officials' decisions related to inmate care, housing, and home confinement are grounded in public policy. Because the court agrees with the United States that the BOP employees exercised discretion in their decision making, the court begins with the presumption that the decisions were grounded in considerations of policy.

In other contexts, the Supreme Court has acknowledged that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986). The court therefore agrees with the United States that given the COVID pandemic, "prison management and operations require a very delicate balancing of prisoner, staff, and public safety with available resources to implement prisoner-housing and medical guidance in a thoughtful, systematic way across BOP's facilities." (Doc. 12, p. 21). So the court holds that the United States has also satisfied the second step of the discretionary-function test, and **GRANTS** the United States' motion to dismiss. (Doc. 12).

The United States separately argues that the claims against it are to be dismissed under the quarantine exception to the FTCA, Alabama Covid Immunity law that shields healthcare providers from COVID-related suits, and because Ms. Monk failed to exhaust her claims of loss of consortium and pain and suffering with the BOP. But the court need not address those arguments because the discretionary-function exception to the FTCA applies.

### III.   Monk's Claims Against the Individual Defendants

Monk sues the individual defendants under *Bivens* for violating Mr. Monk's First, Fifth, Eighth, and Fourteenth Amendment rights. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Monk does not object to dismissal of the *Bivens* claims against the individual defendants under the First, Fifth, and Fourteenth Amendments. (Doc. 32, p. 4). So the court **GRANTS** the individual defendants' motions to dismiss those claims. (Docs. 26, 37).

That leaves the Eighth Amendment. Monk alleges the individual defendants violated Mr. Monk's Eighth Amendment rights by acting deliberately indifferent to Mr. Monk's health and safety by exposing him to and failing to protect him from COVID. She says the officials failed to protect Mr. Monk from COVID, disregarded home confinement or referral to outside medical providers, failed to recognize and screen Monk's risk factors for COVID, and failed to treat Monk when he collapsed in the shower. She also alleges that the prison supervisors failed to properly supervise correctional officers and medical staff at the prison.

The individual defendants argue that the Eighth Amendment *Bivens* claims fail because this case is meaningfully different from *Bivens*, *Davis*, and *Carlson*, and because Congress is best equipped to determine an individual-damages remedy here. And in any event, the individual defendants argue that qualified immunity bars Monk's Eighth Amendment claim.

### A. Rule 12(b)(6)

The individual defendants first argue that Monk's complaint does not meet the standard of review set out in Rule 12(b)(6), *Twombly*, and *Iqbal*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). They argue that only four paragraphs in the complaint (50, 52, 54, and 55) associate a specific defendant with a specific factual allegation and thus does not satisfy the applicable pleading standard.

Because the court agrees with the individual defendants that their claims should be dismissed for the reasons stated below, the court finds it unnecessary to consider this argument.

### B. *Bivens*

The Supreme Court made available a cause of action for money damages against federal officials in their individual capacities for violating constitutional rights in *Bivens*. *See Bivens,* 403 U.S. at 395–97. A *Bivens* claim may only proceed under narrow circumstances. *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022). Suits for monetary damages under *Bivens* have been permitted for violating the Eighth Amendment, as Monk alleges here. *See Carlson v. Green,* 446 U.S. 14, 19 (1980).

To prevail on her *Bivens* claim, Monk must establish that a person acting under color of federal law deprived her husband of his Constitutional rights. *Bivens*, 403 U.S. at 396–97. The parties do not dispute that the named individual defendants were acting under color of federal law, but the individual defendants do argue that the alleged violation is not redressable as a *Bivens* claim.

To prevail, Monk must show that (a) her claims are either analogous to a claim type the Supreme Court has previously recognized under *Bivens*, or (b) if the case presents a new *Bivens* context, that the officials violated a clearly established constitutional right, there are no other remedies available, and that no special factors counsel against extending *Bivens*. *See Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (holding that *Bivens* may not be extended to a new context where special factors counsel hesitation absent affirmative action by Congress).

"A case presents a new *Bivens* context when it is 'different in a meaningful way' from previous *Bivens* cases decided by the Supreme Court." *Montalban v. Samuels*, 2022 WL 4362800 (11th Cir. 2022). Whether a case presents a new context is a fact-specific analysis. *Ziglar v. Abbasi*, 582 U.S. at 138. The second step regarding special factors "must concentrate on whether the Judiciary is well suited, absent congressional

14

action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 137.

While Monk's complaint is unclear on her exact *Bivens* theory, the court gives Monk the benefit of the doubt and reads it to include these four claims: (a) conditions of confinement, (b) failure to train/supervise, (c) loss of consortium, and (d) deliberate indifference to serious medical needs.

**Step One (New Context)**: The court must first consider whether this case presents a new *Bivens* context that is "meaningfully different from the three cases in which the Court has implied a damages action." *Egbert*, 142 S. Ct. at 1803. The defendant bears the burden to show the plaintiff is bringing a claim in a new context.

The Supreme Court originally recognized a *Bivens* claim under the Eighth Amendment where prison officers failed to provide adequate treatment for an asthmatic prisoner. *Carlson v. Green*, 446 U.S. 14, 22–23 (1980). Typically, Eighth Amendment *Bivens* claims arise in the prison context where officials use excessive force against an inmate or deliberately disregard a substantial risk of serious harm to an inmate. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (recognizing *Bivens* claim where prison officials placed a transgender prisoner in the general prison population despite knowledge of a serious danger to the prisoner's safety there). This requires the defendants have a subjective knowledge of the risk.

The court must first consider whether this case presents a new *Bivens* context that is "meaningfully different from the three cases in which the Court has implied a damages action." *Egbert*, 142 S. Ct. at 1803. "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020).

In *Carlson*, the plaintiff sued the BOP on behalf of her deceased son when staff members knew he had asthma, lacked the capability to treat it, kept him in prison against doctors' advice, failed to provide him with

medical attention for eight hours after an asthma attack, gave him drugs and employed a respirator—both of which made the attack worse, and unreasonably delayed his transfer to an outside hospital. *Carlson*, 446 U.S. at 16. Plus, the prison officials' deliberate indifference flowed from racial animus. *Id.*

The Court extended *Bivens* to these claims for two reasons. First, there were no special factors to cause the court to hesitate because the officials did not "enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate," and qualified immunity provided them with adequate protection. Second, Congress did not preclude constitutional-tort liability in this situation.

The individual defendants argue that Monk's claims pose a "superficial similarity" to Carlson and present a new context. *Egbert v. Boule*, 142 S. Ct. at 1805. They point out that COVID was unprecedented and created a different fact scenario, including conditions of confinement, screening for a novel disease, determining risk factors for a new disease, mitigating risk of that disease, making home confinement recommendations, and supervising BOP employees' handling of the pandemic. All these factors were not present in *Carlson*, so defendants say this is a new context. *See Walker v. United States*, No. 3:21-cv-1881, 2022 WL 1472872, at *4 (M.D. Pa. May 10, 2022) ("There is no question that Walker's Eighth Amendment conditions of confinement claim presents a new context…."); *Smith v. Wood*, No. 1:19-cv-3673, 201 WL 13068185, at *5 (N.D. Ga. Oct. 31, 2019) ("Plaintiff's conditions of confinement claims all present new contexts under *Bivens*.").

Monk argues that her claims arise in the same context as *Carlson* because this case involves prison officials who failed to treat an individual for a severe medical condition. Monk acknowledges that the COVID-19 pandemic was unprecedented but argues that it should still be treated like other serious illnesses, and that the crux of her lawsuit is that the prison officials failed to treat Mr. Monk, just like the officials in *Carlson*.

The court agrees with the individual defendants in part. This case presents a new context based on (a) conditions of confinement, (b) failure to train/supervise, and (c) loss of consortium because those claims are different in a meaningful way from *Carlson.*

Monk's conditions of confinement allegations—how Mr. Monk was treated, the measures taken to prevent COVID, the use of home confinement, and the general prison procedures—all differ from *Carlson.* The facts surrounding the BOP officials' actions, the lack of judicial guidance on COVID in 2020, and no legal mandates on the officials to act in a certain way all show that this case is much different from the facts in *Carlson.*

The same is true for Monk's failure to train and failure to supervise allegations. *Stroud v. Warden, USP Lewisburg*, No. 1:22-cv-0515, 2022 WL 17340626, at *5 (M.D. Pa. Nov. 30, 2022) (collecting cases holding that failure-to-supervise claims present a new context for a *Bivens* claim). And Monk's loss of consortium claim also presents a new context. *See Zundel v. Holder*, 687 F.3d 271, 279, 283 (6th Cir. 2012) ("the loss of spousal consortium is not a constitutional right that may be asserted by a spouse in a *Bivens* action."). So the court will proceed to step two on Monk's claims that are based on (a) conditions of confinement, (b) failure to train/supervise, and (c) loss of consortium.

But to the extent that Monk's claims are of deliberate indifference to serious medical needs, her claims do not present a new context. The court will address this theory in Part IV, Qualified Immunity.

**Step Two (Special Factors)**: When a plaintiff attempts to bring a *Bivens* claim in a new context, the court may not imply a *Bivens* remedy if (a) there is alternative federal or state remedy, or (b) special factors—such as encroaching on other branches of government or areas covered by existing federal regulation—that cause the court to hesitate to extend the remedy. *Ziglar*, 137 S. Ct. at 1858. In the end, "[a] court faces only one question: whether there is any rational reason (even one) to think that

Congress is better suited to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 142 S. Ct. at 1805.

The defendants point out that Congress enacted 31 U.S.C. § 3724(a) that permits the Attorney General to settle death claims attributable to BOP officials up to $50,000. Ms. Monk also could have sought BOP administrative remedies. And the defendants argue that because Congress enacted the PLRA over a decade after *Carlson* and chose not to create a standalone damages remedy against individual BOP officers, the court should not do so now.

The court agrees with the individual defendants that the judiciary is not well suited to weigh the costs and benefits of allowing a damages action to proceed under these circumstances because at least one special factor counsels the court's hesitation. As the defendants point out, Congress has provided an alternative remedy in 31 U.S.C. § 3724(a). And "Congress is best positioned to evaluate whether, and the extent to which, monetary and other liability should be imposed upon individual officers and employees of the Federal Government based on constitutional torts." *Hernandez*, 140 S. Ct. at 742. Congress has also otherwise legislated regarding prisoner rights in the PLRA. Even more, allowing these *Bivens* claims to proceed could significantly interfere with prison administration.

For the reasons stated above, the court **GRANTS** the individual defendants' motions to dismiss to the extent that Monk's *Bivens* claims relate to (a) conditions of confinement, (b) failure to train/supervise, and (c) loss of consortium. (Docs. 26, 37).

## IV.   Qualified Immunity

In Part III, the court found that Monk could proceed on her theory that the individual defendants were deliberately indifferent to her husband's serious medical needs. The individual defendants argue that, if even if this is a recognized *Bivens* claim, qualified immunity protects them from the claim.

Qualified immunity protects officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"A district court must dismiss a complaint under Fed. R. Civ. P. 12(b)(6) when the complaint's allegations, on their face, show that an affirmative defense bars recovery on the claim." *Nichols v. Maynard*, 204 F. App'x 826, 828 (11th Cir. 2006). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

To properly assert qualified immunity, the government officials must have been "acting within the scope of [their] discretionary authority when the alleged wrongful act occurred." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019). "The term discretionary authority includes all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Patel v. City of Madison*, 959 F.3d 1330, 1338 (11th Cir. 2020) (cleaned up). The government officials bear the burden to establish that their conduct occurred while acting within the scope of their discretionary authority. *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).

Once the government officials have established they were acting within the scope of their discretionary authority, the plaintiff has the burden to (1) "make out a violation of a constitutional right" and (2) show that "the right at issue was clearly established at the time of [the] alleged misconduct." *Pearson*, 555 U.S. at 232 (quotation omitted). But a court may consider the two prongs of qualified immunity in any order. *Id.* at 236. If the court determines that the right was not clearly established at the time of the alleged misconduct, it need not consider the first prong.

Discretionary Authority: The individual defendants argue that they were acting within the scope of their discretionary authority in all the conduct that led to Monk's alleged constitutional violations. They say that this conduct can be grouped into two primary categories: (1) protecting Monk from COVID, and (2) providing medical treatment to him once he contracted the virus.

The court agrees with the individual defendants that they were acting within the scope of their discretionary authority. The facts alleged in the complaint make clear that the defendants were undertaking duties related to preventing and treating COVID in the prison, and the officials were acting under the discretion afforded to them by Congress, DOJ, and the BOP.

Clearly Established Law: The court will first determine whether Monk's allegations state a claim of violation of clearly established law. A right may be clearly established by (1) a materially similar case that has already been decided; (2) an accepted general principle should control the novel facts of the case with obvious clarity; or (3) the conduct in question so obviously violated the Constitution that no prior case law is necessary. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204–05 (11th Cir. 2012).

The court must determine whether the individual defendants violated Monk's clearly established Eighth Amendment rights by acting deliberately indifferent to Mr. Monk's serious medical needs. Monk argues that case law and egregious conduct show that the alleged violation was clearly established.

Monk points to four cases to prove that the alleged constitutional violation was clearly established. *See Hannah v. Armor Corr. Health Services, Inc.*, 792 Fed. App'x 742 (11th Cir. 2019); *Hoffer v. Jones*, 290 F. Supp. 3d 1292 (N. D. Fla. 2017); *Bryant v. Buck*, 793 Fed. Appx. 979 (11th Cir. 2019); *Brown v. Johnson*, 387 F.3d 1344 (11th Cir. 2004). District courts cannot clearly establish law, so the court will not consider *Hoffer*. And unpublished Eleventh Circuit opinions also cannot clearly establish

law but can be used as evidence that a particular right is *not* clearly established. *See Corbitt v. Vickers*, 929 F.3d 1304, 1319 n. 14 (11th Cir. 2019).

That leaves the court with *Brown v. Johnson* to determine whether that case clearly established Monk's alleged constitutional violation. There, prison officials stopped a prisoner's treatments for HIV and hepatitis, causing him skin and scalp infections, pain in the eyes and vision problems, fatigue, prolonged stomach pains, and susceptibility to future illnesses. *Brown*, 387 F.3d at 1350. The court noted that "[d]eliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment," and that "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Id.* at 1351 (citing *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999)). The court held that "the continuing disregard of Brown's HIV and hepatitis" sufficiently constituted deliberate indifference. *Id.*

The defendants say that there is no clearly established right here, because the COVID pandemic made this situation unique. They say that there is no clearly established right to specific quarantine procedures, COVID testing, home confinement, or specific conditions of confinement to avoid contracting the disease. And as they point out, Monk cited no controlling precedent that Mr. Monk had a clearly established right to protection from COVID or any other novel and highly contagious disease.

The court agrees with the defendants that Monk has failed to meet her burden of establishing that clearly established law applied to her husband's particular facts. "[T]he preexisting law must make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). Rather than meet this level of specificity required, Monk has instead laid out general principles for deliberate indifference claims in factually distinguishable cases.

The caselaw existing at the time of the alleged conduct did not and could not have considered the complexities of the COVID pandemic and the prison's response to it. It is true that prison officials act with deliberate indifference by failing to provide treatment to an unconscious prisoner. *See Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005). And "an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997).

But none of these cases clearly established rights to a particular COVID prevention plan, a right to home confinement, or how to respond to inmates' sickness when an outbreak has occurred throughout the prison. Indeed, no case at the time of the alleged conduct considered the impact a global pandemic may have on officials' decisions. "COVID-19 pose[d] novel health risks to incarcerated inmates—and novel administrative challenges for jail and prison administrators[.]" *Swain v. Junior*, 961 F.3d 1276, 1294 (11th Cir. 2020).

The court also agrees with the individual defendants that the conduct Monk alleges was not egregious enough to clearly violate the Constitution. Monk has not shown "that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without case law on point." *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir. 1997).

Monk has failed to meet her burden of establishing "the right at issue was clearly established at the time of [the] alleged misconduct." *Pearson*, 555 U.S. at 232. So the court will **GRANT** the individual defendants' motions to dismiss the claims against them for violating Mr. Monk's Eighth Amendment rights by acting deliberately indifferent towards his medical needs. (Docs. 26, 37).

## CONCLUSION

For the reasons stated above, the court will **GRANT** the United States' motion to dismiss the claims against it (doc. 12) and will **DISMISS** any claims against the United States Federal Bureau of Prisons. The court will also **GRANT** the individual defendants' motions to dismiss the claims against them. (Docs. 26, 37).

Because defendant Stanley L Dickerson has not moved to dismiss the claims against him, those claims remain.

**DONE** and **ORDERED** on August 7, 2023.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE